TODD W. EDDINS, #5544
1001 Bishop Street
Pauahi Tower, Suite 1320
Honolulu, Hawaii 96813
Telephone No. 808 538.1110
Facsimile No. 808 528.2440
E-Mail: Eddins@Eddinsdefense.com

Attorney for Defendant James Troiano

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR. NO. 05-00261 HG |
| Plaintiff, | ) MEMORANDUM OF LAW IN<br>) SUPPORT OF MOTION |
| vs. | ) |
| JAMES TROIANO, | ) |
| Defendant. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION

### I. Factual Circumstances

On May 9, 2005, at approximately 5:00 a.m., two masked males forced at gunpoint the owner of the Brown Bottle liquor store in Waialua to open the establishment. The males then forced Milton Agader (Agader), to surrender a key

to his store's safe and to open the store's ATM machine. Agader claims that the men took $14,000.00 from the safe and the ATM.

At 8:43 a.m., Honolulu Police Department Detective Darryl Kon conducted a taped interview of Agader. He stated that both men "were all covered up" with "bandannas" or "ski mask[s]." Agader described one male as "the big guy" because he was larger in physical stature than the other man. He saw the male for only "a split second" when his face-covering came off as the males exited the store. Agader "fac[ed] the ground most of the time" and "when [he] got to see the face, it happened so fast"

According to Agader, the big guy was 5 feet, 10 inches "about 170 [pounds]" with a "slim" or "medium" build. The man's age "could have been anywhere from late 20's to 30's." He had "short", "reddish brown" or "kind of brownish", "curly" or "wavy" hair and a mustache. The man was "Portuguese", "kind of tan" and seemed like he "work[ed] outside". They had long-sleeve shirts and long pants. The smaller man wore black shoes, but Agader did not know what type of footwear the larger male wore.

Two days after the robbery, May 11, 2005, James Troiano (Troiano) was arrested. Troiano, a Caucasian, was born on May 25, 1968, and thus almost 37 years old. The police records listed his height as 6 foot 3 inches and his weight at

200 pounds, though at the time of his arrest he more closely approximated 220 pounds. His hair color was reported as brown.

On May 13, 2005, HPD graphic artist Joseph Aragon prepared a composite drawing of the suspect based on Agader's input and description. In the defense's view, the sketch does not comport with Troiano's likeness. It is not known what transpired between Agader and law enforcement personnel (or other individuals) before, during, and after the composite drawing.

Nearly one week after the incident, on May 15, 2005, HPD Detective Brian Johnson showed Agader a "Photographic Lineup". In the non-sequential photo array, six photos were depicted in two rows with Troiano slotted as number 5 (second photo in second row). Agader indicated that the suspect had "reddish-brown" or "brownish" hair, yet all of the individuals in the array (except for Troiano) appear to have dark or black hair. Purportedly, Agader selected Troiano's photo. On a form, he wrote that #5 "I think is the taller of the two suspects".

The circumstances surrounding the photo array and identification of Troiano are presently unknown as the interview was not recorded, and there does not appear to be any report prepared in conjunction with the identification. It is known that Agader viewed a surveillance videotape shortly after the incident, and it is believed that he was shown a photograph of Troiano prior to May 15, 2005.

## II.   The United States Supreme Court's Key Opinions on Eyewitness Identification

Long before the introduction of forensic DNA testing procedures to exonerate innocent citizens convicted on the basis of flawed eyewitness identifications, the United Supreme Court, acknowledged that "[t[he annals of criminal law [were] rife with instances of mistaken identification," United States v. Wade, 388 U.S. 218, 228 (1967). A major factor contributing to the high miscarriage of justice from mistaken identification was the degree of suggestion inherent in the manner in which the prosecution presented the suspect to witnesses for pretrial identification. Id.

The oft-cited Supreme Court cases governing challenges to eyewitness identifications under the Fifth Amendment to the United States Constitution are Neil v. Biggers, 409 U.S. 188 (1972) and Manson v. Brathwaite, 432 U.S. 98 (1977).

Under Manson and Biggers, the trial court must address two core questions in resolving a motion to suppress an identification based on a suggestive pretrial procedure: (1) whether the identification procedure itself was unnecessarily and impermissibly suggestive; and (2) whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive. Neil v. Biggers, 409 U.S. at 198-99.

Where an identification is shown to be suggestive it must then be examined for reliability. "Reliability is the linchpin in determining the admissibility of identification testimony." Manson, 432 U.S. at 114., Suggestivity and reliability are inherently related: "suggestive confrontations are disapproved because they increase the likelihood of misidentification." Biggers, 409 U.S. at 198. Apart from suggestivity, factors relevant to the determination of reliability include (1) the opportunity of the witness to view the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty displayed by the witness at the identification procedure; and (5) the length of time between the crime and the identification. Id. at 199-200.

### III.   The Identification Procedures Employed Were Unnecessarily and Impermissibly Suggestive.

Again, it must be emphasized that the circumstances surrounding the procedures employed during the photo array and purported identification of Troiano are presently unknown because the interview was not recorded, and there does not appear to be any report prepared in conjunction with the identification.[1] It is clear that Agader viewed a surveillance videotape shortly after the incident,

---

[1] The only meaningful method to flesh out the precise factual circumstances will be through an evidentiary hearing on the instant motion.

5

prepared a composite sketch with an HPD graphic artist[2], and (it is believed) was shown a photograph of Troiano prior to May 15, 2005.

Following an evidentiary hearing on the motion, the defense contends that the identification procedure used will be shown to be so impermissibly suggestive that it requires suppression under the due process clause of the Fifth Amendment.

Although many matters relating to the identification procedures are presently unclear, it is known that a non-sequential photo array was conducted. In a non-sequential array, several photographs are shown at once to the witness. In this case, six photographs (two rows of three photographs) were shown to Agader. In a sequential procedure, an eyewitness views only one lineup member at a time and makes a decision (that it is the perpetrator or that it is not the perpetrator) regarding each member prior to viewing another lineup member. The advantage to a sequential lineup is that the witness is not making relative judgments – in other words, there is no tendency for a witness (as in a non-sequential lineup) to identify the person from the lineup who looks most like the culprit relative to the other members of the lineup. After all, there will always be someone who looks more like the culprit than the remaining lineup members. Scientific research concludes that misidentification of individuals is much more prevalent with non-sequential lineups. See, e.g., Gary Wells, Mark Small, Steven Penrod, Roy Malpass,

---

[2] It is also unknown as to what transpired during the composite sketch.

Solomon Fulero and C.A. Brimacombe, *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 Law and Human Behavior 1, 12 (1998); Cutler & Penrod, *Improving the Reliability of Eyewitness Identification: Lineup Construction and Presentation*, 73 Journal of Applied Psychology, 281-90; R.C. Lindsay, e.t. al, *Biased Lineups: Sequential Presentation Reduces the Problem*, 76 Journal of Applied Psychology 796-802 (1991). In short, non-sequential arrays "suggest" to the witness that the culprit is present, and therefore to select the person most closely approximating the culprit.

The structural property of the instant photo lineup – the appearance characteristics of the lineup members – was impermissibly suggestive. It has long been recognized that the rate of selecting an innocent person who fits the eyewitness's prior description of the culprit increases dramatically when others in the lineup do not fit the prior description. See, e.g., Gary Wells & R.C. Lindsay, *On Estimating the Diagnosticity of Eyewitness Nonidentification*, 88 Psychological Bulletin 776-784 (1980). To ensure reliability, lineup participants should be selected so that they fit the description that the eyewitness had given of the culprit. See, e.g., Gary Wells, S. Rydell & E. Seelau, *On the Selection of Distractors for Eyewitness Lineups*, 78 Journal of Applied Psychology 835-844 (1994).

In the photo array, Troiano is the only person who has "brownish" hair as described by Agader. Troiano stands out because his hair is lighter than the other

individuals in the array – all who appear to have black hair. Troiano was described by Agader as being of "slim" (or "medium") build. The suspect's identity is also suggested to Agader because Troiano appears as the slimmest of the six individuals.

Suggestivity in this case also arises from the fact that lead HPD Detective Brian Johnson conducted the photo array and was aware that the suspect was present in the array. When there is close physical distance between a witness and a person conducting a lineup who has knowledge of the suspect's identity, interpersonal processes, such as eye contact, visible facial expressions, hand movements and gestures, and verbal exchanges can suggest an appropriate response to the witness. See, e.g., M.J. Harris & R. Rosenthal, *Meditation of Interpersonal Expectancy Effects*, 97 Psychological Bulletin 363-386 (1985). The deliberate absence of video or audio recordings makes it difficult to know what role Johnson played in the selection by Agader of Troiano.

Further, it should be noted that when an eyewitness makes a selection, the response from the person administering the lineup to the eyewitness strongly affects the confidence of the witness. An affirmation of the selection (i.e. words to the effect that "you got the right guy"), easily convert a tentative identification eyewitness to become quite positive on the identification. C.A. Luus & Gary Wells, *The Malleability of Eyewitness Confidence: Co-witness and Perseverance*

8

*Effects*, 15 Law and Human Behavior 43-57 (1994).  Thus, lineup administration by personnel unsure of the suspect's identify is a recognized mechanism for safeguarding reliable identifications.

### III.   The Identification was not Reliable

As recited above, the Biggers and Manson factors relating to reliability include (1) the opportunity of the witness to view the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty displayed by the witness at the identification procedure; and (5) the length of time between the crime and the identification.  Both Biggers and Manson emphasize "the totality of the circumstances" and note that the factors listed in evaluating reliability are merely illustrative.  Manson, 432 U.S. at 114;  Biggers, 409 U.S. at 192.

Significantly, suggestive police procedures can skew all of the factors set forth in Manson and Biggers.  Research has shown that witness statements concerning their own level of certainty, their opportunity to view the suspect, the detail of the description, and their attention level all can be inflated through the use of suggestive procedures. Bradfield, Wells & Olson, *The Damaging Effect Of Confirming Feedback on the Relation Between Eyewitness Certainty And Identification Accuracy*, 87 Journal Of Applied Psychology 112 (2002); Wells, G.L. & Bradfield, A.L., *"Good, You Identified the Suspect:" Feedback To*

*Eyewitnesses Distorts Their Reports Of The Witnessing Experience*, 83 Journal of Applied Psychology 360-76 (1998); Wells, G.L. & Bradfield, A.L., *Distortions In Eyewitnesses' Recollections: Can the Post-Identification Feedback Effect Be Moderated?*, 10 Psychological Science 138-44 (1999). In short, in assessing the Manson reliability factors, a trial court must be mindful of the ability of suggestive procedures to influence each of those factors.

### a. Opportunity to View

The culprits in the Brown Bottle robbery completely concealed their faces. With respect to the opportunity of Agader to view the suspects at the time of the incident, his identification is unreliable because the purported observation occurred within "a split second". Agader related that the 'big guy's bandanna (or ski mask) came off as the males exited the store. As Agader recounted: "When I got to see the face, it happened so fast". For the most part, during the course of the robbery, Agader faced the ground ("they had me facing the ground most of the time."). The "split second" opportunity for Agader to observe the suspect was as momentary as any eyewitness viewing gets.

### b. Degree of Attention

The factor closely parallels the "opportunity to view" factor. As mentioned, Agader simply saw the suspect for a "split second". Moreover, he was thrust into a stressful, startling event and was held at gunpoint – both of these circumstances

can quite easily be considered other factors in the <u>Manson</u> "totality of the circumstances" equation, but will be discussed here as they compromised Agader's degree of attention.

Much scientific research concludes that stressful and startling events undermine the reliability of an eyewitness identification. For example, one recent study confirmed how stress substantially decreased the ability to make a reliable identification. In the controlled experiment, less than half of 500 soldiers subjected to 40 minutes of stressful interrogation could not identify their interrogators shortly after the process. Charles A. Morgan, et. al., *Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress*, Int. Journal of Law & Psychiatry, 27(3), 265-79 (2004).

That the perpetrator had a weapon can also seriously call into question the reliability of an identification in that the attention of the witness is often focused on the weapon rather than the person committing the crime. "[v]ictims, out of fear, often focus their attention on the perpetrator's weapon, rather than his face. .. Where a weapon is brandished it tends to capture a good deal of attention, thereby reducing the ability to recognize and to recall details about the assailant." <u>United States v. Stevens</u>, 935 F.2d 1380, 1392 (3d Cir. 1991). Citations and parentheses omitted. <u>See, also</u>, Elizabeth F. Loftus et al., *Some Facts About 'Weapon Focus'*, 11 Law & Hum. Behav. 55 (1987); *Loftus and Doyle, Eyewitness Testimony: Civil*

II

*and Criminal,* § 2.10 (2d Ed. 1992); Anne Maass & Gunther Kohnken, *Eyewitness Identification: Simulating The "Weapon Effect,"* 13 Law & Hum. Behav. 397 (1989).

### c. Accuracy of Prior Description

The accuracy of Agader's prior description also leads to a conclusion of unreliability. Within a few hours of the incident, Agader described the "big guy" as 5 feet, 10 inches "about 170 [pounds]" with a "slim" or "medium" build. The man's age "could have been anywhere from late 20's to 30's." He had "short", "reddish brown" or "kind of brownish", "curly" or "wavy" hair and a mustache. The man was "Portuguese", "kind of tan" and seemed like he "work[ed] outside".

Upon his arrest two days after the robbery, Troiano was a couple weeks shy of 37 years old, not in his late 20's. More striking, however, is the inaccuracy attendant to Agander's description of Troiano's physical dimensions. Far from being 5 feet, 10 inches and 170 pounds, Troiano was listed at the time of his arrest as 6 foot 3 inches and 200 pounds (though his weight more closely approximated 220 pounds). Troiano is a large man, and he certainly did not have a "slim" or even "medium" build. Troiano was not dark or tan, or appear as if he worked outside. Further, Troiano is a Caucasian looking male; dissimilar from the common Hawaii description relating to a person of Portuguese ancestry. Troiano's hair color was not "reddish-brown", and while he had a mustache, his

hair was not curly. Thus, Agader's prior inaccurate description of the suspect weighs in favor of unreliability.

### d. Level of Certainty

The level of certainty of Agader's identification can at this point only be gleaned from his statement on the photo array form: "I think [#5] is the taller of the two suspects". The defense asserts that, the statement "I think" does not convey the level of certainty as to identification of a suspect contemplated by the Supreme Court.

In any event, the Biggers "level of certainty" factor is largely discredited in the scientific community. Repeated studies have shown that eyewitness confidence is not predictive of eyewitness accuracy. Wells, et al., *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 Law and Human Behavior 1-39 (1998). Unfortunately for the truth-seeking process, jurors rely overwhelmingly on witness confidence as an indicator of witness accuracy. Id. Confidence has little relation to accuracy yet confidence has a most explosive effect on jurors, and thus the potential for wrongful convictions is magnified through expressions of confidence.

> Eyewitness testimony is likely to be believed by jurors, especially when offered with a high level of confidence, even though accuracy and confidence are not related to one another. Experimental 'jurors' were as likely to believe a witness making an incorrect identification as one who was completely accurate. The crucial determinant was the apparent confidence of the witness, a factor of immense importance to

13

> the average juror. Indeed, some studies have even shown that under certain circumstances a person can be more confident when incorrect than when correct. . . .

Loftus & Doyle *Eyewitness Testimony: Criminal and Civil* § 11 (2d ed. 1992). Simply put, the claim that witness confidence guarantees witness accuracy is simply wrong. However, jurors, based on their intuitive beliefs relating to confidence and accuracy, conclude otherwise and ascribe greater weight to identifications expressed with confidence. See, e.g., Steven Penrod & Brian Cutler, *Wtiness Confidence and Witness Accuracy: Assessing their Forensic Relation*, 1 Psych. Pub. Pol. and Law 817 (1995).

### e. Length of Time between the Crime and the Identification.

On May 15, 2005, Agader was shown a photographic array depicting Troiano. [As mentioned previously, prior to the lineup, Agader reviewed the surveillance videotape and may also have been shown a photo of Troiano. Moreover, it is unknown whether Troiano's physical attributes had been divulged to Agader before the lineup]. The robbery occurred on May 9, 2005, so six days elapsed between the crime and identification. While it was not weeks or even months between the incident and photo array, almost one week had elapsed. The defense asserts that this Biggers factor does not favor the government or defense.

### f.        Cross-racial Identification

Another factor which has been identified as contributing to eyewitness misidentification is that of "cross-racial identification". As Stevens, 935 F.2d 1380 (3d. Cir. 1991), observed, "[s]cholarly literature attacking the trustworthiness of cross-racial identification is now legion." Id. at 1392. The court cited several research papers for the proposition that "persons tend to be less accurate when making a cross-racial identification" and "a cross-racial identification is likely to be more inaccurate than an intra-racial identification." Id. at 1392, n.14.

### V.       Conclusion

For the foregoing reasons, Troiano submits that following an evidentiary hearing the court should suppress evidence relating to the purported identification of him on May 15, 2005 by Milton Agader.

Respectfully submitted,

_____
Todd Eddins

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was duly served upon the following parties via hand delivery on February 23, 2006.

CLARE CONNORS
Assistant United States Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii 96850


PAMELA TAMASHRIO
Ocean View Center
707 Richards Street, PH 7
Honolulu, Hawaii 96813

Attorney for DEFNDANT WENDELL TOKI


DATED: Honolulu, Hawaii, February 23, 2006

TODD EDDINS
ATTORNEY FOR JAMES TROIANO